# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

CYNTHIA FERNUNG,                         :

      Plaintiff,                     :

                               Case No. 3:09CV00495

vs.                                      :

                               District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                       :   Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,              :

      Defendant.                           :

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Cynthia Fernung, a former executive secretary, brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). This Court has jurisdiction to review the administrative denial of her SSI and DIB applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.

Plaintiff asserted in administrative proceedings that she was eligible to receive SSI

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

and DIB because she was under a "disability" within the meaning of the Social Security Act. In the present case, Plaintiff seeks an Order reversing the ALJ's non-disability decision and granting her benefits.  The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.   Background

### A.   Procedural History

Plaintiff protectively filed[2] her SSI and DIB applications on October 14, 2005, asserting that she has been under a "disability" since February 16, 2005.[3]  (Tr. 415-19). Previously, in November 2002, Plaintiff submitted a report to the Social Security Administration stating that fibromyalgia, rheumatoid arthritis, and osteopenia limited her ability to work by causing her extreme pain and fatigue.  (Tr. 116, 124).

Nearly three years later, in October 2005, Plaintiff submitted an updated report to the Social Security Administration indicating that many health problems impede her ability to work including fibromyalgia, rheumatoid arthritis, very thin bones, high blood pressure, tissue swelling throughout her body, migraine headaches, Raynaud's disease, depression, panic attacks, and asthma.  (Tr. 426).  Plaintiff also indicated that she underwent a hysterectomy in June 1998.  *Id*.

---

[2]  A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits.  It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application.  *See* http://www.ssa.gov/glossary.

[3]  Plaintiff filed prior applications for benefits in November 2002.  Those applications were denied in February 2005.  (Tr. 27, 90-92, 374-89).  Plaintiff did not, apparently, seek further review of that decision.

Following initial administrative denials of her applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) Thomas R. McNichols II. ALJ McNichols later issued the written decision concluding that Plaintiff was under a disability beginning in September 28, 2008 when Social Security Regulations considered her be a person of "advanced age." (Tr. 36, 38). Before then, according to the ALJ, Plaintiff was not under a disability and she was not eligible to receive DIB or SSI before September 28, 2008. (Tr. 27-38).

### B.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 51 years old on her alleged disability onset date and during the time period pertinent to the present case. *See* 20 C.F.R. §§404.1563; 416.963[4]; *see also* Tr. 36. Plaintiff has a high school education. *See* 20 C.F.R. §416.964(b)(4); *see* also Tr. 433. She worked for 16 years as an executive secretary. (Tr. 438).

Plaintiff testified at the administrative hearing that she stopped working in October 2002 due to intense pain and fatigue. (Tr. 725). She said that she suffers from fibromyalgia with fatigue and constant pain in her shoulders, elbows, arms, hips, and knees. (Tr. 726). She has Raynaud's syndrome, which causes pain and numbness in her hands especially in winter weather. (Tr. 727-28). She has had migraine headaches since she was a teenager. (Tr. 729-30). She has thin skin that bruises and tears easily. (Tr. 730).

Plaintiff also suffers from depression. At least two days a week she cannot even get

---

[4] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding SSI/DIB Regulations.

out of bed, shower, or get dressed.  (Tr. 730-31).  She also reported having breathing

problems due to chronic bronchitis and asthma.  (Tr. 734).  She has swelling in her feet and

legs as a side effect from medication.  (Tr. 735).  She has cataracts in her eyes.  (Tr. 736).

Plaintiff's most comfortable positing was lying down.  (Tr. 737).  But she had

difficulty sleeping at night.  She explained, "I am just awake.  I'm just awake.  My mind is

whirling.  The pain is sometimes so bad that I just cannot relax enough to fall asleep."  (Tr.

737).

On a good day Plaintiff could walk about ½ a city block; fatigue, pain, and difficulty

balancing would stop her from walking farther.  (Tr. 738).  Fatigue and pain also prevented

her from standing longer than 15 minutes.  She could sit for 30 minutes.  (Tr. 738-39).  She

could lift only 3 to 4 pounds due to pain and lack of arm strength.  (Tr. 739).  She also

testified, "I can climb one flight [of stairs].  I live in a one flight.  I can only do it one time a

day if I do.  I cannot carry anything up, and there are times when I get very breathless by the

time I get to the top of the staircase."  (Tr. 740).

###    C.    Medical Source Opinions

### 1.
### Toni Sublett, M.D.

Plaintiff saw treating physician Dr. Sublett from April 7, 2000 through October 24,

2005  (Tr. 251-72, 277-344, 481-512).  Dr. Sublett treated her for rheumatoid arthritis,

asthma, a breast cyst, Raynaud's, peripheral edema, hepatitis, hypertension, right shoulder

pain, carpal tunnel syndrome, and fatigue.  On May 3, 2002, Dr. Sublett noted that Plaintiff

was starting to get deformed fingers. (Tr. 303). On July 18, 2002, on an disability insurance form, Dr. Sublett reported that Plaintiff had fibromyalgia, severe rheumatoid arthritis, and osteopenia. Plaintiff could work only intermittently. She had work absences with flares, and she was unable to perform work activity. (Tr. 291-93).

On May 23, 2003, Dr. Sublett stated that Plaintiff became totally disabled as of October 28, 2002. (Tr. 276). On May 29, 2003, Dr. Sublett completed a Basic Medical form for a county Department of Jobs and Family Services, reporting that Plaintiff's ability to stand, walk, and sit were effected. She could lift up to 5 pounds. She was extremely limited in her ability to push/pull, bend, reach, and handle. And she was unemployable for 12 months or more, according to Dr. Sublett. (Tr. 273-75).

On July 19, 2004, Dr. Sublett completed a Physical Capacity Evaluation. (Tr. 367-68). Dr. Sublett opined that Plaintiff could stand less than 1 hour in an 8-hour day; walk less than 1 hour in an 8-hour day; sit for about 4 hours in an 8-hour day, with the ability to get up and move. She could lift up to 10 pounds but only rarely. She could occasionally bend and climb steps but never squat, crawl, or climb ladders. *Id.* And she could use her hands 2 or 3 times a week for fine manipulation. *Id.*

In July 2004, Dr. Sublett also completed a mental residual functional capacity assessment.[5] (Tr. 364-66). Dr. Sublett opined that Plaintiff had no limitations in social

---

[5] Plaintiff "residual functional capacity" is an assessment of the most she can do in a work setting despite her physical or mental limitations. 20 C.F.R. §416.945(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

interaction.  Plaintiff had an extreme limitation in her ability to complete a work tasks in a normal work day or work week, process subjective information accurately (depending on her degree of pain), maintain attention and concentration for more than short periods, perform at expected production levels, and behave in an predictable, reliable, and emotionally stable manner.  (Tr. 365).  Dr. Sublett also thought that Plaintiff had an extreme limitation in her ability to tolerate work pressures and would deteriorate under stress.  (Tr. 366).

## 2.
## William Padamadan, M.D.

In April 2006 Plaintiff was examined by Dr. Padamadan for the Ohio Bureau of Disability Determination (BDD).  (Tr. 552-59).  Examination revealed no tender points, no decreased range of motion.  (Tr. 554).  Dr. Padamadan opined, "Based upon this clinical evaluation, in the absence of objective findings of any functional impairment, I do not see any indication for limitation of physical activities."  (Tr. 555).

## 3.
## Edmond Gardner, M.D.

In April 2006 Dr. Gardner reviewed the record on behalf of the Ohio BDD.  He noted that a prior assessment (February 15, 2005) assigned Plaintiff a reduced residual functional capacity.  Dr. Gardner further noted, "the new record has new and material changes."  (Tr. 563).  Dr. Gardner apparently viewed those changes as showing that Plaintiff's impairments had improved because he declined to adopt the prior residual functional capacity.  He wrote, "current medical evidence shows that she has no functional loss.  She had no evidence of

fibromyalgia, tendinitis or bursitis at her current consultive exam."  *Id.*  Dr. Gardner opined

that Plaintiff's impairments were not severe but noted that she "[h]as psych issue" without

elaboration.  (Tr. 563).

### 4.
### Meenal Lothe, M.D.

Dr. Lothe was Plaintiff's treating physician from October 2006 until at least

December 2007.  During that time Dr. Lothe treated Plaintiff for flu and cold symptoms,

shingles, chronic right shoulder pain, Raynaud's syndrome, rheumatoid arthritis,

hypertension, fibromyalgia, muscle pain, water retention, herpes, pain attacks, and

depression with insomnia.  (Tr. 627-61).

In May 2007 Dr. Lothe opined that Plaintiff could lift and carry 5 to 10 pounds

occasionally, and 5 pounds frequently as a result of her lower lumbar tenderness and right

shoulder decreased range of motion and her fibromyalgia.  (Tr. 615A-19).  According to Dr.

Lothe, Plaintiff could stand/walk for less than 2 hours out of 8 and without interruptions for

less than 1 hour uninterrupted, due to bilateral knee tenderness and lumber spine tenderness.

She could sit less than 2 hours out of 8, and she could sit uninterrupted for less than 1 hour

due to lumbar spinal tenderness.  (Tr. 616).  Plaintiff could occasionally climb.  She was

never to stoop, crouch, kneel, or crawl.  She was limited in her ability to push/pull.  (Tr.

617).  And, according to Dr. Lothe, Plaintiff could not perform sedentary work.  (Tr. 619).

### 5.
### Mujeeb Ranginwala, M.D.

Rheumatologist Dr. Ranginwala treated Plaintiff from March 3, 1999 through March

27, 2003.  (Tr. 222-46).  Dr. Ranginwala's treatment notes reveal that on March 27, 1999, he

found Plaintiff had synovitis of her wrists and hands.  (Tr. 242).

On April 8, 2000, no synovitis was found, but she did have pain on palpation of her

left trochanteric bursa area and multiple tender points.  (Tr. 236).  On November 24, 2002,

Dr. Ranginwala found synovitis of her wrist and hands and pain on palpation of her ankle

and metatarsophalangeal joint as well as symptoms of Raynaud's.  (Tr. 225).

**6.**
**Jon Ryan, D.O.**

Plaintiff saw Dr. Ryan for treatment of diffuse aches pain.  (Tr. 682-88).  On

examination in April 2008 Dr. Ryan observed "changes consistent with osteoarthritis noted

at DIPs and PIPs.  There was some slight synovial thickening noted at the PIPs 2, 3, and....

Knee shows some very mild chronic changes."  (Tr. 684).  She had multiple positive trigger

points.  *Id.*  She had normal range of motion, normal reflex strength, and normal gait.  *Id.*

Dr. Ryan also noted no signs or symptoms of rheumatoid arthritis and diagnosed

fibromyalgia.  (Tr. 684).

In May 2008 observations on examination were unchanged.  (Tr. 682).  Laboratory

tests ruled out rheumatoid arthritis.  Dr. Ryan diagnosed myofascial pain/fibromyalgia.  (Tr.

682).

**7.**
**George Schulz, Ph.D.**

Plaintiff was evaluated on March 2, 2006, by consulting psychologist Dr. Schulz for

the Ohio BDD.  (Tr. 514-19).  Plaintiff reported to Dr. Schulz that she had been seen in

counseling in 2003 and in 1986 while going through her divorce. (Tr. 515). She reported

that she took care of her personal needs and watched TV, read, and did chores with her

boyfriend. (Tr. 516). Dr. Schulz diagnosed dysthymia and assigned Plaintiff a Global

Assessment of Functioning (GAF) of 57 (Tr. 517-18), referring to moderate symptoms.[6] *See*

Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34.

Dr. Schulz opined that Plaintiff's ability to relate to others, including coworkers and

supervisors, was minimally impaired; her ability to understand, remember, and follow

instructions was minimally to mildly impaired; her ability to maintain attention and

concentration to perform simple, repetitive tasks with adequate pace and perseverance was

minimally impaired; and her ability to withstand the stress and pressures associated with

day-to-day work activity was moderately impaired. (Tr. 519).

### 8.
### Mental Health Services for Clark County, Inc.

The record contains treatment notes from Mental Health Services of Clark County,

dated February 19, 2004 through May 4, 2007. (Tr. 345-56, 599-608). Plaintiff received

counseling from Melinda Van Noord, M.S. and medication maintenance with psychiatrist

Kalpana Vinschnupad, M.D. *Id.*

In August 2006 Plaintiff underwent a psychosocial assessment with her therapist Ms.

---

[6] Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Commissioner of Social Sec.*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

Van Noord.  (Tr. 609-13).  Plaintiff reported that she was depressed and socially isolated and that her family had rejected her since she became ill.  She had panic attacks.  (Tr. 609).  Ms. Van Noord observed that Plaintiff's affect was blunted, and she was tearful.  Her mood was depressed.  (Tr. 612).  Ms. Van Noord diagnosed major depressive disorder, recurrent and moderate; panic disorder without agoraphobia; and dependant personality traits and she assigned Plaintiff a GAF of 50 (Tr. 613), referring to serious symptoms.  DSM-IV-TR at p. 34.  She also noted that Plaintiff did not "need any ADL [activities of daily living] skill training at this time," and that Plaintiff appeared "to have recreation and leisure needs, but has been less active in the these since she has been depressed."  (Tr. 612).

On May 4, 2007, Dr. Vinschnupad and Ms. Van Noord completed a medical assessment of ability to do work related mental activities.  (Tr. 586-88).  According to them, Plaintiff had poor to no ability to deal with the public, deal with work stresses, function independently, maintain attention/concentration, behave in an emotionally stable manner, demonstrate reliability, and understand, remember, and carry out detailed and complex job instructions.  *Id.*  Plaintiff had fair ability to follow work rules, relate to coworkers, use judgment, and understand, remember, and carry out simple job instructions.  *Id.*

Dr. Vinschnupad and Ms. Van Noord also answered written interrogatories on May 4, 2007.  (Tr. 589-98).  They reported that Plaintiff had major depression and a panic disorder.  They opined that the sum of Plaintiff's mental and physical impairments was greater than the sum of the parts.  (Tr. 590).  Plaintiff had "overall poor coping skills and sense of hopelessness related to her depression.  Poor energy level also affects coping

10

ability." (Tr. 591). She became easily "overwhelmed when faced with pressures – crying, severe anxiety, etc." (Tr. 592). She could not withstand the pressure of meeting normal work standards because "[s]tress would create exacerbation of depression & anxiety. [She w]ould be unable to keep pace of typical work schedule." (Tr. 593). Her concentration was poor and she could not understand, remember, and carry out simple work instructions without close supervision. *Id.* She was unable to behave in an emotionally stable manner. She "could become overwhelmed in work environment-have crying spells, panic attacks, & have to leave." (Tr. 594). She was fearful and avoidant in social situations. She would be frequently absent because of her physical and mental symptoms. *Id.* She could not respond appropriately to changes in a routine setting because "stress/change would exacerbate symptoms." (Tr. 596). She would need close supervision. *Id.*

Plaintiff also had "anxiety in social situations." (Tr. 597). She would not be able to respond appropriately to criticism from supervisors because she "would probably become overwhelmed/ depressed/tearful." *Id.* She had a slight restriction on her daily activities but she had a marked restriction on maintaining social functioning and in deficiencies of concentration, persistence, or pace. (Tr. 597-98).

III.    **Administrative Review**

     A.    **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The

definition of the term "disability" is essentially the same for both DIB and SSI. *See*

*Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory

meaning, a "disability" includes only physical or mental impairments that are both

"medically determinable" and severe enough to prevent the applicant from (1) performing

his or her past job and (2) engaging in "substantial gainful activity" that is available in the

regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI

applicant bears the ultimate burden of establishing that he or she is under a disability. *See*

*Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and*

*Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d

359, 361 (6th Cir. 1978).

### B.     Social Security Regulations

Administrative regulations require ALJs to employ a five-Step sequential evaluation

when resolving whether a DIB/SSI applicant is under a disability. *See* 20 C.F.R.

§416.920(a)(4). Although a dispositive finding at any Step ends the ALJ's review, *see*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review

answers five questions:

1.     Has the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal
       the criteria of an impairment set forth in the Commissioner's Listing
       of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can she perform her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.      ALJ McNichols' Decision

ALJ McNichols pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: 1) generalized arthralgias with the diagnosis of fibromyalgia; 2) a history of right shoulder bursitis; 3) a history of asthma; 4) a history of arthritis; and 5) depression.  (Tr. 31).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.  (Tr. 32).

At Step 4 the ALJ concluded that Plaintiff retained the residual functional capacity to perform light work[7] subject to: alternate sitting and standing at 30-minute intervals; no work above shoulder level on the right side; no work on uneven surfaces; work in a temperature controlled environment with no exposure to irritants or extremes of heat, cold, or humidity; frequent, but not constant, fine manipulation; occasional stooping, kneeling, crouching, and

---

[7]  The Regulations define light work as involving the ability to lift  "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §416.967(b).

crawling; occasional balancing; and occasional stair climbing. (Tr. 33).

The ALJ further found at Step 4 that Plaintiff's mental impairments limited her to low-stress jobs with no production quotas, no requirement to maintain concentration on a single task for longer than 15 minutes at a time, and no exposure to hazards or the general public. *Id.*

The ALJ concluded at Step 4 that Plaintiff was unable to perform her past relevant work as an executive secretary. (Tr. 36).

At Step 5 the ALJ concluded that before September 29, 2008, Plaintiff could perform a significant number of jobs in the national economy. (Tr. 36). But beginning on September 29, 2008, when Plaintiff attained age of 55, she would not be able to transfer any job skills to other occupations. *Id.*

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability before September 29, 2008, and she was therefore not eligible for DIB or SSI before then. (Tr. 27-38).

## IV. __Judicial Review__

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    The Plaintiff's Contentions

Plaintiff contends that the ALJ erred in finding that she was not under a disability before she turned age 55 because his determination was not supported by substantial evidence in the record as a whole. Plaintiff argues that the ALJ erred in rejecting the opinions of Plaintiff's treating physicians, particularly Dr. Lothe's, and the opinions of her treating psychiatrist, Dr. Vinschnupad.

### B. Medical Source Opinions

### 1.
### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley*, 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

16

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §416.927(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians, including supportability, consistency, and specialization. *See* 20 C.F.R. 20 C.F.R. §416.972(d), (f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3.

## 2.
## Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §416.927(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating

medical source opinions under the factors set forth in §416.927(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §416.972(f); *see also* Ruling 96-6p at *2-*3.

### C.     Analysis

The ALJ's decision in Plaintiff's case reveals that he weighed the medical source opinions and other evidence of record under the required legal criteria and reasonably concluded that Plaintiff was not under a "disability" as defined by the Social Security Act. The ALJ considered and rejected the opinions of Dr. Lothe – the medical source opinions most favorable to Plaintiff – under the correct legal criteria.  *See* Tr. 35.  Recalling that Dr. Lothe thought that Plaintiff could not even perform sedentary work (Tr. 619), the ALJ assigned no controlling or deferential weight to this conclusion because Dr. Lothe did not support her opinion with objective medical evidence and because Dr. Lothe's was contrary to the weight of the evidence.  *See id.*  This constituted an application of the legal criteria applicable to determining whether controlling weight was due Dr. Lothe's opinions under the treating physician rule.  *See* 20 C.F.R. §416.927(d)(2).  The ALJ, moreover, continued his evaluation as the Regulations by applying both the supportability and consistency factors.  *See* Tr. 35; *see also* 20 C.F.R. §416.927(d)(3)-(4).  A review of Dr. Lothe's opinions confirms the reasonableness of the ALJ's evaluation because Dr. Lothe did not explain her opinions in any meaningful detail.  *See* 20 C.F.R. §416.927(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The ALJ also compared Dr. Lothe's opinion with Plaintiff's daily activities, the results of clinical tests and examinations, and the opinion evidence of other medical sources as the Regulations permit. *See* 20 C.F.R. §416.927(d)(3), (4). The ALJ further noted, "Dr. Lothe's opinion appears to be based primarily on the claimant's subjective allegations of pain, accompanied by some evidence of tenderness, but objective tests show the claimant to have normal strength, gait, and fairly good mobility." (Tr. 35); *see* 20 C.F.R. §416.927(d)(3).

Substantial evidence supports the ALJ's reasons for not fully crediting Dr. Lothe's opinions. This is seen in the evidence the ALJ pointed to when assessing Plaintiff's residual functional capacity. For example, Dr. Padamadan found no objective findings during a physical examination (Tr. 552-59), and Dr. Gardner concluded that Plaintiff had no severe physical impairment at all. (Tr. 563). The ALJ reasonably relied on these medical source opinions as their opinions reflected their evaluation of the record evidence as a whole and accounted for Plaintiff's credible limitations before September 29, 2008. *See* Tr. 34-36; *see also* 20 C.F.R. §416.927(d)(4).

Moreover, the ALJ further considered Plaintiff's treatment history, and noted that her level of care had been conservative, consisting mostly of medication and counseling. The ALJ recognized, and the records supported, that Plaintiff's treating family physician in 2006, Dr. Turner, noted that "There are some issues of compliance with treatment." *See* Tr. 569-70. Plaintiff attended only 2 of the 9 scheduled physical therapy sessions in 2006. (Tr. 620). She has not required any recent inpatient hospital care. (Tr. 736). Treatment records do not corroborate any significant medication side effects. The ALJ further noted that

19

Plaintiff's testimony suggested a constriction of her interests and activities, but the relatively mild (at best) objective findings of record do reasonably support.  (Tr. 35).  She does some cooking, washes the dishes, reads, watches television, shops at the thrift stores, and is able to ride the bus.  (Tr. 740-42).  The ALJ also observed that during the hearing, Plaintiff gave the impression of being engaged in a great deal of exaggeration.  But she sat throughout the 1-hour hearing and was able to ambulate without any aids.  She had no difficulty sitting or rising.  Despite her subjective complaints, she displayed no signs of pain or anxiety.  (Tr. 35).  These reasons support the ALJ's decision to discount Plaintiff's testimony, *see* Soc. Sec. Ruling 96-7p, 1996 WL 374186 at *8,[8] and his decision to place controlling or significant weight on the opinions of Dr. Lothe.

In addressing Plaintiff's mental residual functional capacity, the ALJ rejected Dr. Vinschnupad's opinion for the same reasons he rejected Dr. Lothe – i.e., Dr. Vinschnupad did not support his opinions with objective medical evidence and because the record lacks supporting evidence.  (Tr. 33).  In support of the ALJ's decision not to place controlling weight on Dr. Vinschnupad's opinions, the ALJ noted, among other things, Dr. Vinschnupad's clinic notes generally reveal rather normal mental status findings as to Plaintiff's affect, thought processes, speech, orientation, insight, and judgment.  (Tr. 662-75, 679-81).  As noted above, Plaintiff testified at the administrative hearing that she does do

---

[8] "In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the bases of ... personal observations, but should consider any personal observations in the overall evaluation of the credibility of the individual's statements." 1996 WL 374186 at *8.

some light cooking.  (Tr. 741).  Notwithstanding her allegations of panic attacks, she shops

for clothes at a thrift store and can ride the bus.  (Tr. 514, 740).  The ALJ found, "This

evidence is compatible with moderate, but not marked, impairment in activities of daily

living, social functioning, and ability to maintain concentration, persistence, or pace. There

is no corroboration of episodes of mental decompensation of extended duration; there is no

evidence that she would decompensate if the mental demands on her were minimally

increased or there were a change of environment; and there is no evidence that she cannot

function independently outside a highly supportive setting." (Tr. 33).  In reaching these

findings, the ALJ did not err.  *See* 20 C.F.R. § 416.927(d)(4) ("Generally, the more

consistent an opinion is with the record as a whole, the more weight we will give that

opinion."); *see also Cutlip v. Secretary of HHS*, 25 F.3d 284, 287 (6th Cir. 1994) ("The

Secretary ... is not bound by treating physician's opinions, especially when there is

substantial medical evidence to the contrary.").

Dr. Vinschnupad's assessment also conflicted with other medical source opinions in

the record.  For example, when Plaintiff was examined by Dr. Schulz, she acknowledged

that she does some cleaning and laundry with her boyfriend.  (Tr. 516).  She reads and

watches television.  *Id.*  She has stated that she has no friends since she stopped working, but

she demonstrated the capacity to cooperate in an interview setting.  (Tr. 514-19).  Dr. Schulz

found her to be euthymic, without signs of anxiety, and able to count backwards by fours

and do simple math.  *Id.*  Such findings constitute substantial evidence in support of the

ALJ's rejection of Dr. Vinschnupad's opinions.

21

Lastly, although Plaintiff contends that substantial evidence in the record as a whole supports the opinions of Drs. Vinschnupad and Lothe, the existence of such evidence, or, indeed, evidence contrary to the ALJ's findings, does not extinguish the substantial evidence supporting the ALJ's findings.  *See Her*, 203 F.3d at 389-90 ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  Because a reasonable mind might accept the above-discussed relevant evidence as adequate to support the ALJ's findings and because the ALJ applied the correct legal criteria, his decision must be affirmed.  *See Rabbers*, 582 F.3d at 651.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final determination be affirmed; and

2.      The case be terminated on the docket of this Court.


January 26, 2011                                    s/ Sharon L. Ovington
                                                  Sharon L. Ovington
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).